IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MARY DIANE MARTIN,

          Plaintiff,                 No. CIV S-03-1934 GGH

     vs.

JO ANNE B. BARNHART,
Commissioner of Social
Security,

                             ORDER

          Defendant.

_____/

       Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act").  For the reasons that follow, plaintiff's Motion for Summary Judgment is denied, and the Commissioner's Motion for Summary Judgment is granted.  The Clerk is directed to enter judgment for the Commissioner.

BACKGROUND

       Plaintiff, born October 15, 1956, applied for disability benefits on January 10, 2001. (Tr. at 45).  Plaintiff alleged she was unable to work since January 26, 1998, due to "severe pain in entire left hip, left leg and left heel from injury to joint, S1 and S2 nerves, and piriphormis muscle, and deep tissue and muscle damage."  (Tr. at 61).  Plaintiff first developed severe pain in her left buttock when she was injured on the job on January 26, 1998.  Plaintiff

worked as a production leader at a Burger King restaurant and was mopping the men's restroom

when a customer "flung open the door" causing an eight-inch C-shaped metal door knob to slam

into her left hip and buttock.  (Tr. at 113).  Plaintiff uses a cane, as recommended by her

physician, Dr. Norman Verhoog, M.D., in 1998 (Tr. at 111), and has not worked since the injury,

although she received a damages award of $26,000 in 1998 for a wrongful termination suit.  (Tr.

306).  She has previously filed for Title II benefits, although she was denied and it appears that

claim has nothing to do with the present claim.  (Tr. at 70).

In a decision dated January 21, 2003, ALJ Robert K. Rogers, Jr., determined that

plaintiff was not disabled.[1]  The ALJ made the following findings:

> 1.    The claimant met the disability insured status requirements
>        of the Act on January 26, 1998, the date the claimant stated
>        she became unable to work, and continues to meet them

---

[1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
>    Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
>    Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
>    Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
>    Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
>    Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
    The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S.Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

1    through the date of this decision.

2    2.    The claimant has not engaged in substantial gainful activity
           since February 10, 1998.
3

4    3.    The medical evidence establishes that the claimant has
           severe sacroiliac pain syndrome, but she does not have an
           impairment or combination of impairments listed in, or
5          medically equal to one listed in Appendix 1, Subpart P,
           Regulations No. 4.
6

7    4.    The claimant's allegations of severe and constant pain and
           medication side effects and [sic] requiring her to spend
           approximately 6 to 8 hours a day lying down, are not
8          credible for the above stated reasons.

9    5.    The claimant has the residual functional capacity to
           perform a full range of light exertional level work, except
10         that she requires and [sic] at-will sit/stand option (20 CFR
           404.1545).
11

12   6.    The claimant is unable to perform her past relevant work.
           (20 CFR 404.1563).

13   7.    The claimant is 46-years-old, which is defined as a younger
           individual (20 CFR 404.1563).
14

15   8.    The claimant has a high school education (20 CFR
           404.1564).

16   9.    In view of claimant's age and residual functional capacity,
           the issue of transferability of work skills is not material.
17

18   10.   Although the claimant's additional non-exertional
           limitations do not allow her to perform the full range of
19         light work, using the Medical-Vocational Guidelines as a
           framework for decisionmaking, there are a significant
           number of jobs in the national economy which she could
20         perform.  Examples of such jobs are: manager, liquor
           establishment; rental facility clerk; and assembly.
21

22   11.   The claimant was not under a "disability" as defined in the
           Social Security Act, at any time through the date of this
           decision (20 CFR 404.1520(f)).
23

24   (Tr. at 18-19).

25   \\\\\

26   \\\\\

3

1  ISSUES PRESENTED

2          Plaintiff has raised the following issues: A.)  Whether the ALJ Improperly

3  Rejected the Opinion of Plaintiff's Treating Physician; B.) Whether the ALJ Rejected Plaintiff's

4  Testimony Without Providing Sufficient Reasons; C.) Whether the ALJ Failed to Consider All

5  Plaintiff's Impairments In Determining Whether Plaintiff Suffered from a Severe Impairment;

6  and,  D.)  Whether the ALJ Erred in Assessing Plaintiff's Residual Functional Capacity and

7  Availability of Jobs.

8  LEGAL STANDARDS

9          The court reviews the Commissioner's decision to determine whether (1) it is

10  based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

11  the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

12  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Saelee v.

13  Chater, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might

14  accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct.

15  1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206

16  (1938).  "The ALJ is responsible for determining credibility, resolving conflicts in medical

17  testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir.

18  2001) (citations omitted).  "Where the evidence is susceptible to more than one rational

19  interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

20  Thomas v. Barnhart, 278  F.3d 947, 954 (9th Cir. 2002).

21  ANALYSIS

22          A.      The ALJ Property Evaluated The Opinion of Plaintiff's Treating Physician

23          Plaintiff contends that the ALJ improperly rejected the opinion of treating

24  physician Dr. Jeffrey W. Grolig, M.D.  Specifically, plaintiff complains that the ALJ did not even

25  discuss the opinions of Dr. Grolig, especially those concerning plaintiff's functional limitations.

26  \\\\\

4

1    On the contrary, the ALJ did discuss Dr. Grolig's opinions as to several issues.

2  In particular, the ALJ noted Dr. Grolig's opinions as to plaintiff's inconsistencies in testing and

3  her issues with motivation and secondary gain.[2] (Tr. at 17).  Further, the ALJ found compelling

4  Dr. Grolig's treatment notes indicating that he believed plaintiff exaggerated her symptoms.  (Tr.

5  at 14).

6    The opinion plaintiff argues the ALJ ignored is that which Dr. Grolig expressed in

7  August 2000 with regard to her physical limitations.  Specifically, plaintiff argues that the ALJ

8  should have adopted Dr. Grolig's opinion that: "she is unable to lift more than 20 pounds

9  frequently or 10 pounds infrequently.  She is also unable to sit more than 5 minutes at a time or a

10  cumulative amount of time more than one hour per day.  She is also unable to stand more than 5

11  minutes at a time or more than one hour per day.  The patient would need a break every 5

12  minutes and is also precluded from bending, stooping, pushing, pulling or lifting.  She is a

13  Qualified Injured Worker and therefore is entitled to vocational rehabilitation or vocational re-

14  training." (Tr. at 147).

15    A treating physician's opinion is generally given greater weight than that of an

16  examining physician because the former is employed to cure and has a greater opportunity to

17  know and observe the patient as an individual.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th

18  Cir. 1989) (quotations and citation omitted).  However, the treating physician's opinion may be

19  disregarded if it is "'conclusionary and unsupported by relevant medical documentation.'"

20  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting Johnson v. Shalala, 60 F.3d 1428,

21  1432 (9th Cir. 1995).  "A treating physician's assessment may be rejected by setting forth

22  specific, legitimate reasons for doing so, and this decision itself must be based on substantial

23  evidence.  This burden can be met by providing a detailed summary of the facts and conflicting

24  clinical evidence, along with a reasoned interpretation thereof." Rodriguez v. Bowen, 876 F.2d

25

26    [2] "Secondary gain" is the attention and sympathy one gains from having an illness.
Mayer v. Apfel, No. 99-16108, 2001 U.S. App. Lexis 545, at *3 (9th Cir. Jan. 11, 2001).

759, 762 (9th Cir. 1989) (quotations and citations omitted).

The ALJ did not specifically reject Dr. Grolig's assessment of plaintiff's functional limitations, but rather disregarded it in light of other substantial other evidence. Dr. Grolig's opinion was conclusionary and contradicted by other relevant medical evidence.

The ALJ noted that Dr. Grolig requested a multidisciplinary evaluation of plaintiff, which revealed "inconsistencies in her testing and some secondary gain and motivational issues." (Tr. at 14). The ALJ also observed Dr. Grolig's opinion of December 19, 2000, that "her gait seems to change during different periods of observation whether or not she is observed in the parking lot, the exam room or the waiting room. There may be some exaggeration of the gait and sitting abnormalities." (Tr. at 14-15).

Significantly, the same day Dr. Grolig made the assessment of plaintiff's functional limitations, he also noted that plaintiff "states she is angry today. She states she is only angry when she comes to see me. . . ." (Tr. at 147). Further, he noted, "the patient is accompanied by the Case Manager. The patient appears quite frustrated and angry. . . . The patient is about the same. . . I suggested trying to work out some type of arrangement so that the patient can have access to a therapeutic pool at least once a day. She states she does not want to use the public pool. . . . I believe this patient has a very negative attitude . . . I have explained to the patient that it is very difficult for me to treat her when she does not want to follow the recommendations." (Tr. at 147-48).

Based on the whole of Dr. Grolig's notes from that day, it appears his opinion as to her functional limitations was made with specific parameters in mind, i.e., qualifying the plaintiff for vocational rehabilitation or re-training with regard to her worker's compensation case. Even more probative is plaintiff's own testimony, which contradicts Dr. Grolig's assessment of her functional limitations. Specifically, plaintiff testified that she can sit for 30 to 40 minutes at a time, not 5 minutes as Dr. Grolig suggested. (Tr. at 301). She also testified that she can stand at one time for about 10 to 15 minutes (not 5 minutes as suggested by Dr. Grolig),

1   and can walk for about 20 minutes at a time.  (Tr. at 302).  Further, plaintiff testified that she is

2   able to drive, and that she does the dishes, laundry and cleaning by pacing herself.  (Tr. at 305,

3   82).  In addition, Dr. Grolig's assessment of plaintiff's ability to lift is confusing in that he

4   opined she "cannot lift more than 20 pounds frequently or 10 pounds infrequently" (Tr. at 147),

5   which appears to suggest that plaintiff can lift, for example, 15 pounds frequently, but not 8

6   pounds infrequently.

7           Instead of relying on Dr. Grolig's contradicted and somewhat confusing opinion

8   as to plaintiff's functional limitations, the ALJ looked to other substantial evidence in the record,

9   including plaintiff's testimony concerning her limitations, the assessment of a state agency

10  consulting orthopedist who found "no significant abnormalities or work-related limitations" (Tr.

11  at 17, 201), and a medical evaluation from September 2000, performed by an orthopedic

12  specialist, Dr. Gilbert H. Lang, M.D., who was hired by Pickering Law Corporation to examine

13  plaintiff.  (Tr. at 16).  Dr. Lang interviewed and examined plaintiff and reviewed her medical

14  records, x-rays, bone scan and MRI.  (Tr. at 133)  He found that plaintiff had the capacity for

15  alternative sitting or standing and that she had a pattern of overuse of her pain medications, that

16  she was precluded from heavy lifting or carrying and more than 20 minutes of sitting or standing

17  or prolonged walking."  (Tr. at 16-17).

18          This opinion by examining physician Dr. Lang contradicts treating physician Dr.

19  Grolig's assessment of plaintiff's limitations, in particular with regard to the amount of time

20  plaintiff can sit and/or stand.  Even plaintiff's own testimony contradicts Dr. Grolig's

21  assessment, as plaintiff admits to more functional ability than described by Dr. Grolig.  Although

22  the ALJ did not spell out in painstaking detail why he failed to credit Dr. Grolig's opinion as to

23  plaintiff's functional limitations, he expressed legitimate concern about the credibility of

24  plaintiff's claim that she must lie down for six hours each day, and noted that Dr. Grolig also had

25  /////

26  /////

1  significant concerns regarding her credibility.[3]  (Tr. at 17).  Dr. Lang also commented on Dr.

2  Grolig's apparent frustration with plaintiff, citing Dr. Grolig's opinion as expressed in his case

3  management recommendations for plaintiff's worker's compensation claim:

4         "[Grolig] feels she has a high potential for symptom embellishment.  Feels her
   three [sic] wishes have nothing to do with pain control and deal with material
5         considerations.  Dr. Grolig feels the best way to manage this patient would be to
   immediately declare her permanent and stationary and come to a rapid settlement
6         of her case with a limited medical award.  Sending her to a new practitioner would
   just serve to delay and prolong the secondary gain issue."

7

8  (Tr. at 137).

9             In sum, Dr. Grolig's assessment of plaintiff's functional limitations was

10  conclusionary and not supported by relevant medical evidence, nor by plaintiff's own testimony.

11  It appears that it was in fact motivated by a desire to rapidly settle plaintiff's worker's

12

13      [3] The record shows Dr. Grolig harbored doubts as to plaintiff's credibility as well as
   frustration with her refusal to follow his recommendations.

14      On August 18, 1998, Dr. Grolig noted that plaintiff had stopped taking Neurontin, as
   prescribed, and explained she needed to resume the medication immediately.  (Tr. at 186).  On
   October 21, 1998, Dr. Grolig noted that he believed "the patient has substantial issues that are
15  perpetuating her chronic pain syndrome . . . . (Tr. at 184).

16      On January 8, 1999, Dr. Grolig noted that a multi-disciplinary Team Evaluation showed
   plaintiff had some "inconsistency in terms of testing.  There were some secondary gain issues
   and motivational issues. . . . The patient still voices some subjective issues, but at this time, I
17  consider the subjective issues greatly out of proportion to the objective findings.  It is also
   important to note that as determined in the Team Evaluation, her husband has disability issues
18  and apparently the patient has had multiple claims in the past." (Tr. at 180-81).

19      On March 31, 1999, Dr. Grolig wrote, "I have explained to her that in general patients
   who have multiple claims and disabled spouses and secondary gain issues are not good
20  candidates for a pain program.  I have also explained that my opinion of her might be subject to
   change especially if she were more willing to undergo non-medication types of treatment such as
   epidural blocks, physical therapy, pain management counseling , etc.  I cannot believe she
21  requires osteopahtic manipulation at this time.  She is requesting this. . . . For now however, I
   would like to see her case settled and I would like to see her move on with her life."  (Tr. at 175-
22  76).

23      On November 23, 1999, Dr. Grolig wrote, "I recommend . . . a Medoral Dosepak. . . . The
   patient is also not keen or interested in this.  She also states that the TENS Unit is not helping
24  whatsoever.  All of this is contrary to my experience with patients who have chronic pain.  I see a
   number of red flags here just as we have noted in the Team Evaluation.  (Tr. at 164-65).

25      On December 19, 2000, Dr. Grolig noted that "her gait seems to change during different
   periods of observation whether or not she is observed in the parking lot, the exam room or the
26  waiting room.  There may be some exaggeration of the gain and sitting abnormalities." (Tr. at
   144).

1    compensation claim. Accordingly, the ALJ was justified in disregarding Dr. Grolig's opinion as

2    to plaintiff's physical limitations.

3            B.      The ALJ Properly Evaluated Plaintiff's Credibility

4            Plaintiff contends that the ALJ erred in discrediting her testimony without legally

5    sufficient reasons. The ALJ made a specific credibility finding that plaintiff's allegations of

6    severe and constant pain requiring her to spend approximately 6 to 8 hours of the day lying down

7    not credible.

8            The ALJ determines whether a disability applicant is credible, and the court defers

9    to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater,

10    94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit

11    credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v.

12    Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

13    supported by "a specific, cogent reason for the disbelief").

14            In evaluating whether subjective complaints are credible, the ALJ should first

15    consider objective medical evidence and then consider other factors. Bunnell v. Sullivan, 947

16    F.2d 341, 344 (9th Cir. 1991) (en banc). The ALJ may not find subjective complaints incredible

17    solely because objective medical evidence does not quantify them. Id. at 345-46.[4] If the record

18    contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ

19    then considers the nature of the alleged symptoms, including aggravating factors, medication,

20    treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the

21    applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or

22    inadequately explained failure to seek treatment or to follow a prescribed course of treatment;

23    \\\\\

24    \\\\\

25

26        [4] This does not mean, however, that the lack of objective evidence to support the pain alleged is irrelevant to the analysis.

and (3) daily activities.[5]  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally

SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician

and third party testimony about nature, severity, and effect of symptoms, and inconsistencies

between testimony and conduct, may also be relevant.  Light v. Social Security Administration,

119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations,

see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for

medical diagnosis.  Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Absent

affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony

must be clear and convincing.  Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595,

599 (9th Cir. 1999).

        In this case, the ALJ held that the "objective medical records demonstrated a left

sacroiliac pain syndrome," but that the "clinical signs and laboratory findings have been fairly

minimal with normal motor functioning, reflexes, straight leg raising and radiological and other

laboratory studies."  (Tr. at 15).  With regard to plaintiff's allegations of "constant and severe

pain to the extent that she is required to spend 6 hours a day lying down or that she otherwise

cannot perform the demands of an 8-hour workday, within the limitations found here, are not

credible."  (Tr. at 16).  To support this credibility determination, the ALJ explained that "the

record has demonstrated inconsistencies in her presentation and testing since 1999, as well as

possible secondary gain issues."  (Tr. at 16).  The ALJ also found:

        that her subjective complaints have been greatly out of proportion to the objective
        medical findings.  As noted above various clinical and laboratory evaluations,
        including plain x-rays and MRI studies have demonstrated very little, if any, in the
        way of objective abnormalities that could reasonably account for her level of
        subjective complaints.  An evaluation for Pickering Law Corporation found that

        [5]  Daily activities which consume a substantial part of an applicants day are relevant.
"This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily
activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in
any way detract from her credibility as to her overall disability.  One does not need to be utterly
incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)
(quotation and citation omitted).

1  she had the capacity for alternative sitting and standing and that she had a pattern
   of overuse of her pain medications.  The examination indicated that the claimant
2  was precluded from heavy lifting or carrying and more than 20 minutes of sitting
   or standing or prolonged walking.  As noted above, the agency's consulting
3  orthopedist found no significant abnormalities or work-related limitations.  The
   claimant's own treating specialist, Dr. Grolig, noted the claimant's problem with
4  inconsistencies in testing and secondary gain and motivational issues.  In short,
   the undersigned cannot credit the claimant's statements purporting to indicate that
5  she is essentially nonfunctional because of her pain.  In an "exertional daily
   activities questionnaire" completed by the claimant on February 4, 2001, she
6  described an average day as consisting of making the beds, doing laundry, lying
   down, doing dishes, reading a lot, grooming and dressing, grocery shopping 3
7  times a month and usually with the help of her husband and doing the
   housecleaning while pacing herself and of having had to give up camping, fishing,
8  hiking and swimming.

9  (Tr. at 16-17).

10        Plaintiff argues that the ALJ improperly "relied on statements such as that by Ms.

11  Martin's first Worker's Compensations doctor, Dr. Verhoog, that, '[a]t this time, I can find no

12  objective findings to support subjective complaints.'"  Plaintiff argues that the ALJ, in relying on

13  these statements, "failed to mention and even misstated the bulk of Dr. Grolig's findings."

14        On the contrary, it was Dr. Grolig who opined, after several months of seeing

15  plaintiff, that "at this time, I consider the subjective issues greatly out of proportion to the

16  objective findings."  (Tr. at 180).  The ALJ did not rely solely on statements by other doctors in

17  making the credibility determination.  Rather, he relied on Dr. Grolig's own findings that

18  plaintiff showed inconsistencies in testing and exaggeration of symptoms, as well as his opinion

19  that plaintiff had secondary gain and motivational issues.  Further, the ALJ examined plaintiff's

20  daily activities, which showed plaintiff still performed many household chores while pacing

21  herself, that she could drive and that she attended church weekly.  (Tr. at 16, 82-83).  In this case,

22  the ALJ did consider the objective medical findings, and then also considered other evidence

23  relating to plaintiff's inconsistencies, her daily activities, and her treating doctor's assessment of

24  her subjective complaints.  In addition to these factors, the undersigned notes that the record

25  demonstrates plaintiff regularly resisted suggested treatment. (Footnote 3, supra).  Based on the

26  foregoing record evidence, substantial evidence supports the ALJ's credibility determination.

11

1        C.    <u>In Determining Whether Plaintiff Suffers From A Severe Impairment Under Step</u>

2    <u>Two, The ALJ Properly Considered the Combination of All Plaintiff's Impairments</u>

3        Plaintiff contends that in considering plaintiff's impairments at step two, the ALJ

4    found only plaintiff's sacroiliac pain syndrome to be severe, but failed to consider plaintiff's

5    depressive disorder and hypertension.  Plaintiff contends that impairments "may, and do, cause

6    serious vocational limitations, particularly including fatigue, headache, irritability and lethargy,

7    as well as exacerbation of the perception of pain."

8        An impairment is not severe only if it "would have no more than a minimal effect

9    on an individual's ability to work, even if the individual's age, education, or work experience

10   were specifically considered."  SSR 85-28.  The purpose of step two is to identify claimants

11   whose medical impairment is so slight that it is unlikely they would be disabled even if age,

12   education, and experience were taken into account.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 107 S. Ct.

13   2287 (1987).  "The step-two inquiry is a de minimis screening device to dispose of groundless

14   claims."  <u>Smolen v. Chater,</u> 80 F.3d 1273, 1290 (9th Cir. 1996).

15       The ALJ found plaintiff's sacroiliac pain syndrome to be severe, but found that

16   plaintiff did not have a severe mental disorder over any continuous 12-month period or any other

17   chronic conditions satisfying the 12-month duration requirement. (Tr. at 15.).

18       With regard to plaintiff's depression, the ALJ noted that plaintiff underwent a

19   consultative psychiatric examination on November 1, 2001.  (Tr. at 15).  Dr. Stephen M.

20   Greenleaf, M.D., assessed that plaintiff was experiencing mild to moderate depressive disorder.

21   Plaintiff, however, explicitly denied depression.  (Tr. at 15, 244).  She also said her memory,

22   attention, concentration and appetite were good.  (Tr. at 244).  Dr. Greenleaf noted, however, that

23   on the social security forms, she described "severe mental stress secondary to the chronic pain

24   and financial burden."  (Tr. at 244).  Dr. Greenleaf also noted that "she is very active in the

25   church and there has been no deterioration in her social life."  (Tr. at 246).  Despite plaintiff's

26   statements to the contrary, Dr. Greenleaf assessed a mild to moderate depressive disorder.  The

ALJ noted this and observed that plaintiff has "no longitudinal history involving any mental health treatment or other intervention demonstrating the presence of a severe mental health disorder over any continuous 12-month period.  In any event, disability has not been established on the basis of the medical or mental listings (nor does the claimant's attorney so contend)." (Tr. at 15-16).  The ALJ concluded that the depressive disorder did not by itself, or in combination with plaintiff's other impairments, amount to a severe impairment.  Plaintiff made no mention of depression during the hearing, and denied being depressed elsewhere in the record.  The ALJ's assessment of plaintiff's alleged depressive disorder was not erroneous.

With regard to the hypertension, it appears that plaintiff began to develop symptoms of this condition in late 2001.  (Tr. at 273).  Plaintiff's doctor, Edward L. Dolci, M.D., prescribed plaintiff Altace to treat this condition.  (Tr. at 273).  On January 3, 2002, Dr. Dolci noted that "patient's blood pressure today was okay." (Tr. at 273).  On September 25, 2002, Dr. Dolci did not mention hypertension in his notes from plaintiff's examination.  (Tr. at 271).  Although the plaintiff did not allege hypertension on her application for benefits, which preceded the onset this condition, she did not mention it during the hearing.  The fact that plaintiff even experienced hypertension was buried in the medical record.  Once located, the record indicated that plaintiff was able to successfully control the condition with medication.  Accordingly, the ALJ did not err by "screening out" this impairment.

D.    The ALJ's Assessment of Plaintiff's RFC and the Availability of Jobs

First, plaintiff asserts that the ALJ's hypothetical to the vocational expert did not include the limitations identified in plaintiff's testimony or by her treating physician.  In particular, plaintiff asserts that the ALJ's hypothetical was inadequate because he ignored plaintiff's "symptoms of pain, headache, depression, irritability, fatigue and lethargy and the nonexertional limitations these symptoms cause." Plaintiff argues that the ALJ wrongly failed to acknowledge in his hypothetical: plaintiff's inability to stand for more than one hour, total in a workday; her inability to sit for more than one hour, total, in a day; her need to function in an

environment with little peer or public contact as determined by the Commissioner's consulting psychiatrist, Dr. Greenleaf; and, her need for unscheduled frequent breaks.

Hypothetical questions posed to a vocational expert must include all the substantial, supported physical and mental functional limitations of the particular claimant. Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir. 1995); see Light v. Social Sec. Admin., 119 F.3d 789, 793 (9th Cir. 1997).  If a hypothetical does not reflect all the functional limitations, the expert's testimony as to available jobs in the national economy has no evidentiary value. DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  But see Thomas v. Barnhart, 278 F.3d 947 (9th Cir. 2002) (approving hypothetical directing VE to credit specific testimony which VE had just heard); Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993) (failing to include all limitations in a hypothetical may be harmless error if the ALJ's conclusions are supported by other reliable evidence).  While the ALJ may pose to the expert a range of hypothetical questions, based on alternate interpretations of the evidence, substantial evidence must support the hypothetical which ultimately serves as the basis for the ALJ's determination.  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).[6]

Ultimately, the ALJ concluded that plaintiff is capable of performing a full range of light exertional level work except that she requires an at-will sit/stand option.  (Tr. at 17). "Light" work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds while mainly standing and walking.  20 CFR 404.1567(b). The ALJ held that plaintiff's at-will sit/stand option would limit plaintiff to less than a full range of light work.

At the hearing, the ALJ asked the expert to assume a hypothetical person with the same age and education as the claimant and who has the limitations discussed above.  The expert

---

[6]  Similarly, "[t]he ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel."  Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  The ALJ is free to accept them if they are supported by substantial evidence or reject them if they are not.  Id. at 756-757.

1  opined that the plaintiff could not do her past work, but that she would be able to perform

2  alternative jobs consisting of "manager of a liquor establishment, SVP 6, 'light' exertion, of

3  which there are 150,000 jobs in the United States; rental facility clerk, SVP 2 (unskilled), 'light'

4  exertion, of which there are 30,000 jobs in the United States; and assembly jobs, SVP ranging

5  from 2 to 4 (i.e., unskilled and semiskilled), also involving light exertion, of which there are

6  20,000 jobs in the U.S. economy." (Tr. at 17-18).

7          The ALJ took into account plaintiff's functional limitation, i.e., the need to

8  alternate sitting and standing, and concluded that she therefore required an at-will sit/stand

9  option.  As discussed above, the ALJ did not err in rejecting Dr. Grolig's opinion that plaintiff

10  could sit for only five minutes at a time and for a total of one hour in the day.  This limitation

11  was contradicted by plaintiff's own testimony concerning her ability to sit for longer periods of

12  time.  The ALJ did not err in excluding plaintiff's testimony from his hypothetical because, as

13  discussed above, his credibility determination was not in error.  Also discussed above is the

14  ALJ's credibility determination as to plaintiff's subjective complaints, which was not in error.

15          Further, the ALJ did not err by not including a limitation of limited public or peer

16  contact.  Plaintiff misstates her "need" to function in an environment with little peer or public

17  contact.  In fact, Dr. Greenleaf noted only that "rapport is marginal and there is some irritability.

18  Nonetheless she was appropriate in the waiting room and she cooperated with me effectively.

19  The patient *can* function in an environment with little peer or public contact.  The patient can

20  tolerate reasonable and constructive criticism." (Tr. at 248) (emphasis added).  Considering that

21  plaintiff denied any psychiatric problems, including depression, that Dr. Greenleaf's assessment

22  was only that plaintiff suffered a mild to moderate depressive disorder, and that she told Dr.

23  Greenleaf she remained active in church and her social life – a finding that plaintiff requires an

24  environment with little public contact would be inconsistent with substantial evidence in the

25  record.

26  \\\\\

15

1          It is unclear from the ALJ's decision what ability he attributed to plaintiff in terms

2   of standing or walking in one day.  It is clear, however, that the ALJ did not find credible

3   plaintiff's allegations that "she is required to spend 6 hours a day lying down or that she

4   otherwise cannot perform the demands of an 8-hour workday" within his prescribed limitations.

5   (Tr. at 16).  The ALJ cited an evaluation by Dr. Lang, who stated she had the capacity for

6   alternative sitting and standing, and properly disregarded Dr. Grolig's opinion as to plaintiff's

7   limitations, as discussed above.  The ALJ also noted that the agency's consulting orthopedist

8   found no significant abnormalities or work-related limitations.  (Tr. at 16-17).  Based on all this

9   evidence, the ALJ accounted for plaintiff's functional limitations by acknowledging her need to

10  alternate sitting and standing.  This assessment of plaintiff's functional limitation was proper and

11  was accounted for by the ALJ's hypothetical to the vocational expert.

12         Next, plaintiff argues that the ALJ erred by not allowing questions regarding the

13  number of jobs available in plaintiff's region of the country.  Specifically, plaintiff argues that

14  defendant failed to meet her burden to show that a significant number of jobs existed that

15  plaintiff could perform because there was no evidence as to the number of jobs in her region or in

16  several other regions of the country.

17         The regulations provide that work "exists in the national economy" when it either

18  exists in the region claimant lives, or in several other regions in the country.  See 20 CFR §

19  404.1566.  Further, the regulation provides: it does not matter whether work exists in the

20  immediate area in which you live.  Id.  Although there was no real reason for the ALJ to restrict

21  the attorney's question to the expert in the way he did, his restriction does not constitute error.

22         Finally, plaintiff argues that the vocational expert's numbers as to available jobs

23  are "junk science" in that his methodology is unreliable.  The vocational expert testified as to the

24  number of jobs plaintiff could do that would allow an at-will sit/stand option.  Plaintiff attacks

25  the expert's numbers because he acknowledged that he had no database which reduced the

26  numbers to account for the sit/stand option.  He testified that his numbers were based on talking

16

1  to people in his field and from the employment development department, the department of

2  rehabilitation, and job placement.  (Tr. at 314-15).  In other words, his numbers were based on

3  his knowledge as an expert in the field.  In this circuit, an ALJ is not prohibited from relying on

4  such testimony from a vocational expert.  See Johnson v. Shalala, 60 F.3d 1428 (9th Cir. 1995)

5  (no error for an ALJ to rely on expert testimony that deviated from the Dictionary of

6  Occupational Titles).  In this case, the ALJ did not err in relying on the expert's testimony.

7         Because the vocational expert testified to jobs plaintiff could do as performed in

8  the national economy, based on limitations supported by the record, substantial evidence

9  supports the ALJ's decision.

10  CONCLUSION

11         Accordingly, plaintiff's Motion for Summary Judgment is DENIED, the

12  Commissioner's Cross Motion for Summary Judgment is GRANTED, and the Clerk is directed

13  to enter Judgment for the Commissioner.

14  DATED: 9/23/05

15                                    /s/ Gregory G. Hollows

16                                    _____
                                      GREGORY G. HOLLOWS
                                      U.S. MAGISTRATE JUDGE
17  GGH:mb
    Martin1934.ss

18

19

20

21

22

23

24

25

26